Charles E. Tompkins (*pro hac vice* motion forthcoming)
cet@willmont.com
**WILLIAMS MONTGOMERY & JOHN LTD.**
1607 22nd Street NW, Suite 300
Washington, D.C. 20008
Telephone: (202) 791-9951
Facsimile: (312) 630-8586

Eric R. Lifvendahl (*pro hac vice* motion forthcoming)
erl@willmont.com
**WILLIAMS MONTGOMERY & JOHN LTD.**
233 S. Wacker Drive, Suite 6800
Chicago, IL  60606
Telephone: (312) 443-3200
Facsimile: (312) 630-8500

Eustace de St. Phalle (CA Bar # 171900)
EdeSaintPhalle@rlslawyers.com
**RAINS LUCIA STERN ST. PHALLE & SILVER, PC**
220 Montgomery Street, 15th Floor
San Francisco, CA 94104
Telephone: (415) 341-9341
Facsimile: (925) 609-1690

*Attorneys for Plaintiff Flextronics International USA, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FLEXTRONICS INTERNATIONAL USA, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>HOKURIKU ELECTRIC INDUSTRY CO., HDK AMERICA, INC., ROHM CO., LTD., AND ROHM SEMICONDUCTOR U.S.A., LLC,<br><br>    Defendants. | Case No.<br><br>**COMPLAINT OF FLEXTRONICS INTERNATIONAL USA, INC.**<br><br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................. 2

      A.      Plaintiff............................................................................................... 2

      B.      Defendants .......................................................................................... 3

         1.      HDK ......................................................................................... 3

         2.      ROHM ..................................................................................... 4

III.    CO-CONSPIRATORS AND AGENTS ............................................................... 4

         1.      Alps ......................................................................................... 5

         2.      Kamaya ................................................................................... 5

         3.      KOA ........................................................................................ 6

         4.      Midori..................................................................................... 6

         5.      Panasonic ................................................................................ 7

         6.      Susumu.................................................................................... 7

         7.      TOCOS ................................................................................... 8

         8.      Walsin ..................................................................................... 8

IV.     JURISDICTION AND VENUE .......................................................................... 9

V.      TRADE AND COMMERCE.............................................................................. 10

VI.     FACTUAL ALLEGATIONS ............................................................................. 12

      A.      Background on Resistors .................................................................. 12

      B.      Early 2000s: Resistor Prices Collapse ........................................... 13

      C.      Defendants Conspire to Restrain Competition............................... 15

      D.      The U.S. Subsidiary Conspirators Participated in the Conspiracy .......... 19

      E.      Defendants' Collusive Discussions Were Intended to, and Did, Further Their Agreement to Stabilize Resistor Prices ........................................... 19

         1.      The Type of Information Discussed Was Highly Competitively Sensitive, Enabling Collusion and Market Impact to the Benefit of Defendants and the Detriment of Flex .................................................................. 19

      F.      Defendants' Conspiracy Worked: Prices Stabilized and Profitability Returned ............................................................................................ 20

VII.    CHARACTERISTICS OF THE RESISTORS MARKET ............................................ 20

    A.    Industry Concentration.................................................................................. 20

    B.    High Barriers to Entry .................................................................................. 20

    C.    Inelastic Demand........................................................................................... 21

    D.    Interchangeable, Commodity-like Products.................................................. 22

    E.    Declining Demand ......................................................................................... 23

    F.    Excess Manufacturing Capacity.................................................................... 23

    G.    Opportunities for Conspiring and Sharing Information............................ 24

VIII.   FRAUDULENT CONCEALMENT............................................................................ 25

IX.     EFFECTS OF THE CONSPIRACY ........................................................................... 26

X.      CAUSE OF ACTION ................................................................................................. 28

XI.     DEMAND FOR JUDGMENT..................................................................................... 29

Plaintiff Flextronics International USA, Inc., on behalf of itself and the affiliated entities identified in attachment A hereto (collectively, "Flex") brings this action for damages and injunctive relief under Section 4 of the Clayton Act against Hokuriku Electric Industry Co., HDK America, Inc., ROHM Co., Ltd., and ROHM Semiconductor U.S.A., LLC (collectively, "Defendants") for the Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Numerous other persons injured by the Defendants' and their co-conspirators' price-fixing conspiracy have filed Section 1 Sherman Act claims in this Court. This action is an individual action separate from the direct purchaser class actions currently pending before the court. Flex has elected to exclude itself (opt out) of the direct purchaser class action.

Based on investigation of its counsel, Flex alleges on information and belief as follows:

## I.      INTRODUCTION

1.      Flex brings this action against Defendants, who are large manufacturers of linear resistors ("Resistors"), for conspiring between themselves and with certain other Resistor manufacturers to charge Flex and others supra-competitive prices for Resistors in violation of Section 1 of the Sherman Act.

2.      At least as early as July 2003, Defendants and their co-conspirators (collectively, "the Conspirators") agreed to work together to artificially stabilize and increase Resistor prices and preserve market shares globally. The Conspirators executed their scheme through meetings and direct communications concerning the price, output, capacity, and other competitively sensitive data regarding Resistors in order to coordinate the Conspirators' market behavior.

3.      The Conspirators were members of the Japan Electronics and Information Technology Industries Association ("JEITA") and its Passive Components Business Committee. JEITA was composed of and controlled by the Conspirators, which provided a forum to carry out their conspiracy. Senior officials from the Conspirators served as executives of JEITA and ran the meetings. At a July 2003 Committee meeting, the Conspirators agreed on a procedure for facilitating coordination of industry behavior with the aim of reducing output and stabilizing Resistor prices. The Conspirators' anti-competitive behavior caused Flex to pay supra-competitive prices for Resistors purchased in the United States and elsewhere from July 1, 2003 until at least August 1, 2014 (the "Relevant Period").

4.      The Conspirators also colluded through in-person meetings, telephone conversations, and

email exchanges between individual competitors. These individual co-conspirator communications furthered the agreements reached at the JEITA meetings.  The Conspirators' conspiratorial conduct, including regular sharing of sensitive information about pricing, market performance, and capacity, permitted the Conspirators to stabilize and raise prices, and to restrain competition.

5.    Similar to the capacitors market, certain conditions in the Resistors market rendered it particularly susceptible to the Conspirators' manipulation.  Resistors are interchangeable commodities and Resistor sellers compete largely on price.  A small number of manufacturers dominate the Resistors market, and high barriers to enter into the market reduce the risk that new market entrants could quickly undermine the effectiveness of the alleged conspiracy.

6.    The Conspirators concealed their illegal conduct through a variety of means including collusive exchanges at JEITA industry conferences, a private forum that the Conspirators controlled and limited to co-conspirator manufacturers. The Conspirators also took steps to avoid detection by ensuring that meeting minutes were not publicly distributed.  The Conspirators also attempted to sanitize incriminating language in those minutes to avoid revealing the collusive nature of their actions.  The Conspirators' concealment was successful, as their conspiracy remained a secret until the summer of 2015, when media organizations reported that Panasonic was seeking leniency from the United States Department of Justice for Panasonic's participation in anticompetitive conduct in the Resistors market.

7.    This suit seeks to recover the overcharges Flex paid as a result of the conspiracy, as well as treble damages, attorneys' fees, and other applicable relief.

## II.    PARTIES

8.    Whenever this Complaint alleges an act, deed, or transaction of any corporation, that allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

### A.    Plaintiff

9.    Plaintiff Flextronics International U.S.A., Inc. is a California corporation with its principal place of business located at 6201 America Center Drive, San Jose, California 95002. Flextronics International USA, Inc., brings this suit on behalf of itself and all affiliated entities (collectively referred

to herein as "Flex"), which are identified in Attachment A.  Flex manufactures electronic products and other goods at locations around the world, including in the United States.

10.     Flex directly purchased Resistors for the purpose of manufacturing electronic products for Flex's customers, including U.S.-based customers, and for use by United States end-users. Flex's products are sold for consumer, medical, automotive, aerospace, and defense applications, among others.

11.     Flex directly purchased approximately $500 million worth of Resistors from the Conspirators, the Conspirators' subsidiaries and affiliates, or agents controlled by the Conspirators during the Relevant Period, and has suffered injury as a result of the Conspirators' anticompetitive and unlawful conduct.

12.     During the relevant period, Flex purchased Resistors directly from the Conspirators both in the United States and abroad for incorporation into finished goods sold in the United States.

13.     During the Relevant Period, Flex held frequent negotiations with certain Conspirators regarding the price and volume of Resistors.  These negotiations began with Requests for Quotation ("RFQs") which were issued to the Conspirators by Flex.  Flex then negotiated via multiple methods, including face-to-face negotiations in the United States.  Flex executives in the United States approved or authorized the price at which Flex purchased Resistors.

14.     Flextronics International USA, Inc. is the designated assignee of the claims of its relevant affiliates, pursuant to a specific written agreement whereby any of the antitrust claims described in this Complaint against the Conspirators that are held by the Flex affiliates identified in Attachment A are assigned to Flextronics International USA, Inc.

**B.     Defendants**

**1.     HDK**

15.     Defendant Hokuriku Electric Industry Co. ("HDK Co.") is a Japanese corporation with its principal place of business located at 3158 Shimo-okubu, Toyama City, Toyama 939-2292, Japan. HDK Co. has been developing and supplying Resistors since 1943 and is one of the world's leading manufacturers of Resistors.  HDK Co. is the largest manufacturer of thick film chip Resistors used in automobiles. During the Relevant Period, HDK Co. manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers,

including abroad for inclusion into finished products sent to the U.S.

16.    Defendant HDK America, Inc. ("HDK America"), a wholly owned subsidiary of HDK Co., is an Illinois corporation with its principal place of business located at 200 N. Northwest Highway, Suite 201, Barrington, Illinois 60010. During the Relevant Period, HDK America, either directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed to United States purchasers Resistors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, HDK Co.

17.    Defendants HDK Co. and HDK America together are referred to herein as "HDK."

**2.    ROHM**

18.    Defendant ROHM Co., Ltd. ("ROHM Co.") is a Japanese corporation with its principal place of business located at 21 Saiin Mizosaki-cho, Ukyo-ku, Kyoto 615-8585, Japan. During the Relevant Period, ROHM Co. manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

19.    Defendant ROHM Semiconductor U.S.A., LLC ("ROHM USA"), a Delaware limited liability corporation, is a wholly owned subsidiary of ROHM Co. with its principal place of business located at 2323 Owen Street, Suite 150, Santa Clara, California 95054. In addition to its headquarters office, ROHM USA maintains no fewer than sixteen additional sales offices located throughout the United States. During the Relevant Period, ROHM USA, either directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed to United States purchasers Resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, ROHM Co.

20.    Defendants ROHM Co. and ROHM USA together are referred to herein as "ROHM."

**III.    CO-CONSPIRATORS AND AGENTS**

21.    The following firms and corporations, not named as Defendants herein, participated as Co-Conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Flex reserves the right to name some or all of these persons as Defendants and to name additional Co-Conspirators.

/ / /

### 1. Alps

22.     Alps Electric Co., Ltd. ("Alps Electric") is a Japanese corporation with its principal place of business in Tokyo, Japan. During the Relevant Period, Alps Electric manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

23.     Alps Electric (North America), Inc. is a subsidiary of Alps Electric with its principal place of business located at 3151 Jay Street, Suite 101, Santa Clara, California 95054. Alps Electric (North America), Inc. also maintains offices in Detroit, Michigan; McAllen, Texas; Dublin, Ohio; San Diego, California; Austin, Texas; and Redmond, Washington. During the Relevant Period, Alps Electric (North America), Inc. – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers Resistors manufactured by its corporate parent, Alps Electric.

24.     Alps Electric and Alps Electric (North America), Inc. are together referred to herein as "Alps."

### 2. Kamaya

25.     Kamaya Electric Co., Ltd. ("Kamaya Electric") is a Japanese corporation with its principal place of business located in PSA Building 3F, 6-1-6 Chou, Yamato-shi Kanagawa, 242- 0021, Japan. During the Relevant Period, Kamaya Electric manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S. Since 2006, Kamaya Electric has been a subsidiary of Walsin Technology Corporation, which owns all or nearly all of Kamaya Electric.

26.     Kamaya Inc. is a wholly owned subsidiary of Kamaya Electric with its principal place of business located at 6407 Cross Creek Boulevard, Fort Wayne, Indiana 46818. Kamaya Inc. maintains a sales office at 4163 Cleveland Ave, #1, San Diego, CA 92103, and a warehouse at 28-A Concord Street, El Paso, TX 79906. During the Relevant Period, Kamaya Inc. – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers Resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parents, Kamaya Electric and Walsin Technology Corporation.

27.     Kamaya Electric and Kamaya Inc. are together referred to herein as "Kamaya."

### 3.   KOA

28.     KOA Corporation ("KOA Corp.") is a Japanese corporation with its principal place of business located at 2-17-2 Midori-Cho, Fuchu-Shi, Tokyo 183-0006, Japan. KOA Corp. is one of the world's leading manufacturers of Resistors, and the largest manufacturer of thick film chip Resistors used in automobiles. KOA claims to have 30% market share in Japan and 40% market share in the U.S. for fixed Resistors.[1] During the Relevant Period, KOA Corp. manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

29.     KOA Speer Electronics, Inc. ("KOA Speer"), a subsidiary of KOA Corp., is a Delaware corporation with its principal place of business located at 199 Bolivar Drive, Bradford, Pennsylvania 16701. During the Relevant Period, KOA Speer, either directly or through its business units, subsidiaries, agents, or affiliates, sold and distributed to United States purchasers Resistors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, KOA Corp.

30.     KOA Corp. and KOA Speer are together referred to herein as "KOA."

### 4.   Midori

31.     Midori Precisions Co., Ltd. ("Midori Precisions") is a Japanese corporation with its principal place of business located in Tokyo, Japan. During the Relevant Period, Midori Precisions manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

32.     Midori America Corp. is a wholly owned subsidiary of Midori Precisions with is principal place of business located at 2501 E. Chapman Ave., Suite 260, Fullerton, CA 92831. According to its website, Midori America Corp. was "established for the purpose of serving the North, Central, and South American markets . . . [a]s the sales, marketing and distribution arm"[2] of Midori Precisions that

---

[1] KOA website, www.koaglobal.com/en/ir/top-message, last checked June 26, 2018.

[2] Midori America Corp. website, www.midoriamerica.com/about, last checked June 26, 2018.

"maintains a complete inventory of Midori standard products[.]" During the Relevant Period, Midori America Corp. – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers Resistors manufactured by its corporate parent, Midori Precisions.

33.     Midori Precisions and Midori America Corp. are together referred to herein as "Midori."

**5.     Panasonic**

34.     Panasonic Corporation is a Japanese corporation with its principal place of business located at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until October 1, 2008, Panasonic Corporation operated under the name of Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric"). Panasonic Electronic Devices Co. Ltd. ("PED") is a former Japanese subsidiary of Panasonic Corporation that was absorbed by Panasonic Corporation around April 2012. During the Relevant Period, Matsushita Electric, Panasonic Corporation, and PED (referred to together as "Panasonic Corp.") manufactured, sold, and distributed Resistors either directly or through their business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

35.     Panasonic Corporation of North America ("PNA"), a wholly owned subsidiary of Panasonic Corporation, is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, New Jersey 07102. During the Relevant Period, PNA, either directly or through its business units, subsidiaries, agents, or affiliates (including, without limitation, Panasonic Industrial Sales Company), sold and distributed to United States purchasers Resistors manufactured by business units, subsidiaries, agents, or affiliates of its corporate parent, Panasonic Corporation.

36.     Panasonic Corp. and PNA are together referred to herein as "Panasonic."

**6.     Susumu**

37.     Susumu Co., Ltd. ("Susumu Co.") is a Japanese corporation with its principal place of business located in Kyoto, Japan. During the Relevant Period, Susumu Co. manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

38.     Susumu International (USA) Inc. is a subsidiary of Susumu Co. with its principal place of business located in Palisades Park, New Jersey, and with offices located in North Mankato, Minnesota

and San Jose, California. According to its company website, Susumu International (USA) is a sales and marketing arm of Susumu Co. During the Relevant Period, Susumu International (USA) – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers Resistors manufactured by its corporate parent, Susumu Co.[3]

39.     Susumu Co. and Susumu International (USA) Inc. are together referred to herein as "Susumu."

**7.     TOCOS**

40.     Tokyo Cosmos Electric Co. ("TOCOS Electric") is a Japanese corporation with its principal place of business located in Zama, Japan. During the Relevant Period, TOCOS Electric manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

41.     TOCOS America is a wholly owned subsidiary of TOCOS Electric with is principal place of business located at 1177 E. Tower Road, Schaumburg, IL 60173. During the Relevant Period, TOCOS America – either directly or through its business units, subsidiaries, agents or affiliates – sold and distributed to United States purchasers Resistors manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, TOCOS Electric.

42.     TOCOS Electric and TOCOS America are together referred to herein as "TOCOS."

**8.     Walsin**

43.     Walsin Technology Corporation ("Walsin Technology Co." or "WTC") is a Taiwanese corporation with its principal place of business located at 566-1, Kao-Shi Road, Yang- Mei, Tao-Yuan, Taiwan. During the Relevant Period, Walsin Technology Co. manufactured, sold, and distributed Resistors either directly or through its business units, subsidiaries, agents, or affiliates to United States purchasers, including abroad for inclusion into finished products sent to the U.S.

44.     Walsin Technology Corporation U.S.A. ("Walsin USA") is a wholly-owned subsidiary of

---

[3] Susumu International (USA) Inc. website, www.susumu-usa.com, last checked June 29, 2018.

1 Walsin Technology Co. with its principal place of business located at 6032 Fieldstone Drive, Dallas,

2 Texas 75252. During the Relevant Period, Walsin USA – either directly or through its business units,

3 subsidiaries, agents or affiliates – sold and distributed to United States purchasers Resistors

4 manufactured by certain business units, subsidiaries, agents, or affiliates of its corporate parent, Walsin

5 Technology Co., as well as Kamaya Electric Co.

6      45.    Walsin Technology Co. and Walsin USA are together referred to herein as "Walsin."

7      46.    On information and belief, certain Resistor manufacturers that also manufactured

8 capacitors participated in both a conspiracy to fix the price of capacitors as well as Resistors.

9 **IV.   JURISDICTION AND VENUE**

10      47.    Flex brings this action under Sections 4 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to

11 recover treble damages and costs of suit, including reasonable attorneys' fees, against Defendants for the

12 injuries that Flex has suffered from the Conspirators' violations of Section 1 of the Sherman Act, 15

13 U.S.C. § 1.

14      48.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331,

15 1337(a) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

16      49.    Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 and 28 U.S.C §

17 1391(b), (c) and (d) because, during the Relevant Period, Defendants resided, transacted business, were

18 found, or had agents in this District, and a substantial portion of the affected interstate trade and

19 commerce discussed below has been carried out in this District.

20      50.    This Court has personal jurisdiction over each Defendant, because each Defendant:

21 transacted business throughout the United States, including in this District; sold Resistors throughout the

22 United States, including in this District; had substantial contacts with the United States, including in this

23 District; or committed overt acts in furtherance of their illegal scheme and price-fixing conspiracy in the

24 United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury

25 to persons residing in, located in, or doing business throughout the United States, including in this

26 District.

27      51.    The Conspirators purposefully and knowingly directed the conspiracy alleged herein

28 toward U.S. markets.  Each Conspirator sold Resistors abroad for inclusion in products shipped to the

U.S. and coordinated prices abroad for products shipped to the U.S.  Each Conspirator also maintained U.S. subsidiaries throughout the Relevant Period through which it marketed and sold Resistors to U.S. purchasers.

52.     Based on information and belief, the Conspirators colluded with each other to coordinate their behavior in U.S. markets and directed their conspiracy at U.S. markets. Examples of these collusive activities include the following:

53.     ROHM, KOA, HDK, and Susumu discussed the performance of U.S. automotive end-markets for Resistors, with the goal of coordinating their behavior in these markets, during a January 2008 JEITA Resistor Information Exchange Meeting.

54.     The Conspirators discussed the performance of the U.S. Resistor market, with the goal of coordinating their sales and marketing activities in the U.S. market, during an August 25, 2010 meeting of the JEITA Passive Components Business Committee and Resistors Working Group, attended by all Defendants as well as co-conspirators Alps, Susumu, and Midori.

55.     HDK Co., ROHM, and KOA, along with other Resistor manufacturers, promoted coordination between the firms present in U.S. markets by discussing their companies' chip Resistor sales in the United States during a September 2013 meeting of JEITA's "Chip Resistor Expert Committee."

56.     Panasonic and KOA discussed KOA's sales to North America in private meetings during the Relevant Period.

57.     HDK and Panasonic employees discussed Resistor products sold to "A Co." in September 1, 2008 email correspondence. On information and belief, "A Co." was code for customer Apple, Inc., a U.S. corporation.

## V.     TRADE AND COMMERCE

58.     The activities of the Conspirators, as described in this Complaint, were within the flow of and substantially affected interstate and import commerce.

59.     During the Relevant Period, the Conspirators sold substantial quantities of Resistors, including to Flex, in a continuous and uninterrupted flow of interstate commerce, including through and into this District and elsewhere.

60.     The Conspirators' conduct both within and outside the United States caused direct, substantial, and reasonably foreseeable anticompetitive effects upon interstate and import commerce within the United States.

61.     Defendants manufactured certain Resistors outside the United States that were sold to Flex for inclusion into finished products sent to the United States.  Defendants also manufactured certain Resistors outside the U.S. that were sold within the United States. These sales constitute domestic or import commerce.

62.     Through the unlawful activities alleged herein, Defendants substantially and foreseeably affected commerce throughout the United States, causing injury to Flex. Defendants—directly and through their respective parents, subsidiaries, business units, agents, affiliates, successors, and predecessors—knowingly and intentionally engaged in a conspiracy to fix, raise, maintain and/or stabilize prices in the United States and elsewhere for Resistors that were included in finished products imported to the U.S. That conspiracy unreasonably restrained trade and artificially inflated the prices for Resistors and for manufactured products incorporating Resistors imported into the United States.

63.     Defendants engaged in conduct both inside and outside of the United States that caused direct, substantial, and reasonably foreseeable anticompetitive effects upon interstate commerce within the United States.

64.     Specifically, Defendants marketed, sold, or distributed Resistors to be shipped or billed to customers, including Flex, in the U.S.  Such sales constitute domestic or import commerce.

65.     The Conspirators knew, including from sales and billing records, direct communications with Flex, customer negotiations, and market research that a significant portion of the Resistors sold or distributed to Flex would be incorporated into products manufactured for Flex's U.S. purchasers and/or shipped to the U.S.

66.     The Conspirators' anticompetitive conduct caused purchasers in the United States to pay supra-competitive prices for manufactured products that incorporated Resistors that Flex had purchased from the Conspirators. These overseas sales thus had a substantial, direct, and reasonably foreseeable effect on U.S. commerce.

67.     Resistors sold overseas directly to Flex that are imported into the United States similarly

have a substantial, direct, and reasonably foreseeable effect on U.S. import commerce.

68.     To the extent any sales of Defendants' Resistors to Flex do not constitute domestic or import commerce, the Defendants' unlawful activities with respect to those sales had a direct, substantial, and reasonably foreseeable effect on U.S. commerce that gives rise to the claims asserted herein.  The Conspirators' anticompetitive conduct described herein directly, foreseeably, and substantially inflated the price at which Flex management in the United States authorized Flex affiliates outside the United States to purchase Resistors. This conduct gave rise to a claim by Flex affiliates outside the U.S. when those affiliates purchased Resistors at prices artificially inflated by the alleged conspiracy.

69.     The anticompetitive conduct described herein, and its substantial and foreseeable effect on U.S. commerce, proximately caused antitrust injury to Flex, including to its foreign affiliates. The resulting injuries to Flex amounted to tens of millions of dollars or more. As the natural and predictable consequences of Defendants' anticompetitive conduct, Defendants reasonably should have anticipated—or did anticipate—these injuries to Flex.

## VI.     FACTUAL ALLEGATIONS

### A.     Background on Resistors

70.     Resistors are electrical components that limit or regulate the flow of electrical current in an electronic circuit. Resistors can also be used to provide a specific voltage for an active device such as a transistor. The resistance is the measure of opposition to the flow of current in a Resistor. More resistance means more opposition to current.

71.     Resistors are considered "passive" electronic components because they regulate rather than generate electrical current and do not require electrical power to operate. Resistors are a fundamental component of electrical circuits used in electronic devices such as televisions, cell phones, computers, automobiles, and kitchen equipment. Many such devices will contain multiple – sometimes hundreds – of Resistors per device.

72.     Resistors may be divided into two basic categories – linear resistors and non-linear resistors. In basic terms, a linear resistor is a resistor in which the current produced is directly proportional to the applied voltage. Linear resistors consist of fixed and variable resistors. A nonlinear resistor is a resistor whose current does not change linearly with changes in applied voltage. Non-linear

resistors are excluded from this Complaint.

73. Linear resistors can be created in a variety of ways. The most common type used in electronic devices and systems is the carbon-composition Resistor. In carbon-composition Resistors, fine granulated carbon is mixed with clay and hardened. The resistance depends on the proportion of carbon to clay; the higher this ratio, the lower the resistance.

74. Two other common types of linear Resistor used in many electronic devices are thick and thin film Resistors. Thick and thin film Resistors are characterized by a ceramic basic encompassed by a resistive layer. Thin film Resistors have a thickness in the order of .1 micrometer or smaller while thick film Resistors are about a thousand times thicker. Thick film Resistors tend to be more accurate, have a better temperature coefficient, and be more stable. Thus, thin film Resistors are used in technologies requiring a high level of precision. Conversely, thick film Resistors are preferred for applications where these requirements are not necessary. Though each type of linear Resistor has properties that may render it more or less useful for a given electronic device, many manufacturers, including Defendants, manufacture multiple different types of linear Resistors. Generally, linear Resistors are most commonly used in consumer electronics such as computers and audio/visual devices.

75. Throughout the Relevant Period, Defendants sold linear Resistors to: (1) Original Equipment Manufacturers ("OEMs") who incorporate Resistors into their finished products, (2) manufacturers like Flex who create or assemble electrical circuits that ultimately are incorporated into finished products manufactured by OEMs and other product manufacturers, and (3) electronic component distributors who buy Resistors directly from manufacturers and resell them.

**B.    Early 2000s: Resistor Prices Collapse**

76. Signing and implementation of the international Information Technology Agreement of 1996 ("ITA") precipitated major declines in prices in the Japanese Resistor industry. Resistor prices fell by about 30 percent from 1997 to early 2000 in Japan's protected market.

77. Prices for the Resistor products that Japan was exporting fell by approximately 20 percent over 1997-2000. This suggests that the exported products sold to foreign buyers were initially priced lower than products sold into the domestic market, as would be expected with a protected domestic market. As implementation of the ITA continued, however, this divergence between domestic and export

prices of Japanese Resistors disappeared. After 2001, Japan's domestic and export Resistor price indexes roughly converge and show a similar pattern of movement.

78.     Globally, robust economic conditions in the 1990s resulted in an explosion of demand for consumer electronics that, in turn, resulted in strong demand for Resistors. However, economic growth slowed significantly in 2001, causing a corresponding decline in demand for Resistors. According to U.S. Census Bureau figures, shipment values for Resistors manufactured in the United States dropped by more than 20% from 2000 to 2001.[4]

79.     Amidst this weak economic climate, purchasers of Resistors began applying significant pressure on the industry to lower prices. Indeed, between 2001 and 2002, global prices for Resistors dropped significantly.

80.     This had a devastating impact on Resistor manufacturers' profitability, forcing some manufacturers to produce components at or below the cost of production. Facing significant losses, manufacturers were forced to reduce work forces, consolidate, close plants, and reduce capacity. During this period, many manufacturers of passive electronic components such as Resistors were operating at between 60 and 70% while vendors were "swimming in excess supply and fighting for contracts" according to a 2002 EBN report.

81.     Despite falling global prices for Resistors, and even after Resistors prices underwent a sharp decline through 2000, both domestic and export prices for Japanese Resistors roughly stabilized— or even increased. From 2002 through early 2005, Resistor export prices increased by about 20% to a level coinciding with domestic Resistor prices. Japanese Resistor prices, both domestic and for export, declined moderately from 2005 through the end of 2006 before beginning a prolonged period of increase, followed by stability, through the end of 2014. Indeed, the data suggests an elevation in Resistor prices of 20-25% over 2007-2014, compared with prices at the end of 2001.

82.     Another consequence of this increased competition was the increased use by Resistor

_____

[4] See U.S. Census Bureau Statistical Abstract of the United States: 2003, https://www2.census.gov/library/publications/2004/compendia/statab/123ed/tables/manufact.pdf, at table 1011, last checked June 29, 2018.

purchasers of online reverse auctions for passive electronic components such as Resistors. Unsurprisingly, the use of online reverse auctions was vigorously opposed by manufacturers such as the Conspirators. Yet, given the market power of many Resistors purchasers, pro-competitive practices such as reverse auctions could only be squelched if the industry as a whole acted together.

## C.   Defendants Conspire to Restrain Competition

83.   Based on information and belief, the rebound in Japanese Resistor prices that occurred after 2002 followed by further price increases after 2006 was the result of coordinated efforts among Japanese Resistor manufacturers to restrain competition and stabilize and increase Resistor prices. Despite weak economic conditions, purchasers of Resistors were often committed to inflexible production or delivery deadlines to their respective customers, and accordingly could be forced to accept a price increase in order to avoid production delays or customer dissatisfaction.

84.   The Conspirators carried out regular collusive discussions in meetings hosted by JEITA, which provided the Conspirators with both a consistent forum for these discussions as well as a mechanism for ensuring compliance with the conspiratorial agreement by all competitors. As early as July 2003, the Conspirators agreed to promote cooperation and reduce competition through JEITA meetings involving the regular exchange of strategic information among competitors, enabling the Conspirators to coordinate their behavior with the overall effect of reducing competition and stabilizing Resistor prices.

85.   As early as 2003, the Conspirators agreed to restrain competition to halt price erosion and maintain or increase prices.  The Conspirators carried out the conspiracy through regular collusive discussions under the auspices of JEITA, as well as through discussions among individual competitors. The Conspirators facilitated the coordination of their behavior and eliminated competition through these regular meetings, which provided a mechanism for coordinating behavior concerning current and future prices, capacity, costs, sales, forecasts, and in other competitively sensitive areas.

86.   JEITA meetings often included what are commonly referred to as "passive components" which include Resistors, capacitors, and inductors. Many of the capacitor manufacturers that attended JEITA Passive Component Business Committee meetings have pled guilty for their participation in a conspiracy to fix and maintain capacitor prices.  Many of these meetings are the same meetings the

Conspirators attended.

87.     During the relevant period and in furtherance of the conspiracy, at the JEITA meetings the Conspirators ignored corporate formalities and instead referenced and referred to one another without distinguishing between a parent and a subsidiary. For example, HDK or KOA referred to the corporate family generally.  The Conspirators did not distinguish between corporate families because, in part, information obtained from competitors was shared throughout the corporation.  On information and belief, the Conspirators also would use abbreviations or code names for one another to hide their identities and the conspiracy.

88.     The Conspirators entered the conspiracy to foster cooperation, stabilize prices, and restrain competition in the Resistors industry. At a July 9, 2003 meeting of JEITA's Passive Components Business Committee, the participating Conspirators agreed on a procedure for facilitating coordination of industry behavior in their subsequent meetings.  The procedure included sharing: (1) current sales and changes in production of Resistors, (2) business conditions judging from current orders received, (3) market trends, (4) product trends, (5) overseas production status, (6) future outlook information, and (7) shared industry topics.

89.     During the Relevant Period, the Conspirators communicated and shared information about specific customers in order to maintain or increase Resistor prices sold to that customer. Based on information and belief, the Conspirators shared information about specific OEMs and Electronics Manufacturing Services ("EMS") Companies like Flex in order to maintain or increase Resistor prices sold to OEMs and EMS customers.

90.     Throughout 2003 and 2004, the Conspirators, including ROHM, Panasonic, HDK, Kamaya, and KOA, attended meetings at which sensitive, non-public information about Resistors was shared with the purpose of stabilizing prices and reducing competition.

91.     At an August 2005 JEITA Passive Components Business Committee meeting attended by Alps, Panasonic, KOA, and others, an agreement was reached by the attendees as to the method of conducting and exchanging information going forward. The information the Conspirators exchanged allowed them to fix and maintain Resistor prices.

92.     During 2006, the Conspirators and other Resistor manufacturers, including Kamaya,

1  Panasonic, ROHM, KOA, HDK, Kamaya, Sakae Tsushin, Teikoku Tsushin, Taiyosha, Alps, and

2  TOCOS met and exchanged Resistor sales information, including sales as a percentage of the previous

3  period, in order to coordinate their market behavior.

4      93.    Throughout 2007 and 2008, the Conspirators continued to meet and exchange information

5  as part of the conspiracy. The meetings included JEITA meetings, social outings, and golf events. For

6  example, ROHM, Panasonic, HDK, and KOA met and exchanged competitive information in no fewer

7  than five JEITA-sponsored forums occurring in 2008 alone. Information exchanged between and among

8  the Conspirators included non-public sensitive information about the companies' production, capacity,

9  sales, prices, volume, sales to EMS companies like Flex, and technical capabilities. Often, emails about

10  the information exchanges included warnings to keep the information confidential, not to share the

11  information, and referred to competitors by code to keep identities secret.

12      94.    As an example of one such exchange, in April 2008 Panasonic employees emailed one

13  another with the title Confidential Competitor Information (KOA). The email included information

14  Panasonic received from a KOA employee about KOA's monthly production volume for certain

15  Resistors, future strategy on production, and pricing information. The email also contained confidential

16  information obtained from "R Co.," which is believed to be code for Defendant ROHM.

17      95.    In addition to the formal exchange of information about Resistors at the JEITA meetings,

18  the Conspirators met one-on-one to exchange non-public sensitive information as part of the conspiracy.

19  On information and belief, one such meeting included the exchange of pricing information between

20  Panasonic and HDK in September 2008. The information exchanged is believed to be the pricing

21  information for Resistors for a large U.S. company that was also a customer of Flex.

22      96.    On information and belief, JEITA's Passive Components Business Committee held a

23  "Resistor Information Exchange Meeting" on October 30, 2008, attended by ROHM (represented by

24  Osamu Maeda and Hiroshi Kaida), KOA (Kunio Misawa), Panasonic (Yoshinori Hourai), HDK (Keiichi

25  Shimada), Taiyosha (Senji Hibino), Alps (Nakarai), and Midori (Okamura). The minutes state that "[a]ll

26  attendees carried out information exchange." The meeting involved coordinating discussions and

27  presentations, including presentations by competitors HDK, KOA, Taiyosha, Midori, Alps, and ROHM's

28  performance in comparison to previous years. The next day, Panasonic's Yoshihiro Hashimoto and

Yoshinori Hourai, KOA's Akira Nonomura and Kunio Misawa, ROHM's Hiromichi Katafuchi and Hiroshi Kaida, HDK's Kazuo Nomura and Keiichi Shimada, and Taiyosha's Akihiro Katada and Senji Hibino attended a Resistors meeting in Nagoya, Japan, from October 31 until November 1, 2008. Attendees held another collusive "information exchange meeting" on October 31 and participated in a golf session on November 1, providing further opportunities for collusive discussions.

97.     In 2009 and 2010, the Conspirators continued to attend JEITA meetings, including specifically ROHM, HDK, KOA, Taiyosha, Alps, Sakae Tsushin, Teikoku Tsushin, and Panasonic. As at prior meetings, the Conspirators exchanged non-public information about their sales, capacity, and projections in order to maintain the price of Resistors. The information presented at JEITA meetings often focused on specific markets such as cars, cell phones, notebook computers, and televisions.

98.     In 2011 and 2012, the Conspirators met both in JEITA meetings and separately to exchange confidential, non-public information as part of the Resistors conspiracy, including JEITA meetings in at least January, February, and August 2011, and January and May 2012. The information exchanged allowed the Conspirators to coordinate their market behavior and successfully maintain or increase prices.

99.     At JEITA meetings in 2011 and 2012, the Conspirators shared information about their companies' past sales and future projects, including for specific products like cell phones or televisions, and specific markets including Japan, Thailand, Europe and the U.S.

100.     During a meeting of JEITA's Capacitor and Resistor/General Components Committee in May 2012, Panasonic, KOA, and HDK representatives presented on their companies' respective FY 2011 sales amounts, profit and losses, and current sales information, breaking out current performance data by product type (including Resistors), effect of exchange rates on sales, and other company-specific data. This information exchange enabled the Conspirators to adjust their behavior in response to the information presented and thereby further coordinate their activities.

101.     From 2003 to 2014, JEITA's Passive Components Business Committee and Resistors Working Group provided regular meetings and forums that the Conspirators used to exchange competitive information.

102.     The Conspirators continued to meet and exchange information in furtherance of the

conspiracy until a July 2014 JEITA meeting at which an investigation into antitrust compliance was announced.

**D.      The U.S. Subsidiary Conspirators Participated in the Conspiracy**

103.    Based on information and belief, each Conspirator family's corporate parent dominated and controlled the finances, policies, and business decisions of their various subsidiaries, including the U.S. subsidiaries. This included the parent companies' control over the prices set by the subsidiaries.

104.    The subsidiary of each Conspirator family performed functions under the direction and control of the foreign-based Conspirator's parent's officers and managers. As a means of control, the Conspirators' foreign parent corporations "seconded" their employees to their U.S. and other subsidiaries so that these employees could act a conduit for the parents' decisions and conspiratorial agreements and implement them at the subsidiary level.

105.    The foreign Conspirators also maintained control over their U.S. subsidiaries by sitting on boards of the U.S. subsidiaries.

106.    The conspiracy was organized at the parent level and carried out by both executives and employees of the Conspirators' corporate parent and subsidiaries, including those in the U.S. Information learned at the parent level at JEITA meetings or through other communications with competitors was often shared with the subsidiaries. Additionally, employees of the Conspirators' subsidiaries also participated in conspiratorial communications and meetings, and reported the information to other offices, including to the parent.

**E.      Defendants' Collusive Discussions Were Intended to, and Did, Further Their Agreement to Stabilize Resistor Prices**

107.    The Conspirators' discussions exhibited the characteristics of collusion among competitors that creates and furthers a conspiracy to stabilize prices and reduce competition.

**1.      The Type of Information Discussed Was Highly Competitively Sensitive, Enabling Collusion and Market Impact to the Benefit of Defendants and the Detriment of Flex**

108.    Particular types of data exchanges are more likely than others to reduce strategic uncertainty in the market and facilitate coordination among competitors. Strategic information relates to current or future prices, capacity, costs, sales, forecasts, customer information, marketing plans, and

actual and planned investments, among others. This competitively sensitive information is not the type of information that would normally be exchanged by companies that are actually competing with each other, since exchange of this information provides important advantages to a true competitor. The fact that the communications among the Conspirators involved this type of information indicates that the purpose was to coordinate behavior rather than to compete more effectively.

**F.     Defendants' Conspiracy Worked: Prices Stabilized and Profitability Returned**

109.     Defendants' conspiracy had its intended effect. The conspiracy successfully halted the decline in the price of Japanese Resistors, and even achieved price increases above the pre-conspiracy levels. Defendants' conspiracy also succeeded in stabilizing and increasing the prices of Resistors purchased by United States OEMs and EMS companies.

**VII.     CHARACTERISTICS OF THE RESISTORS MARKET**

110.     The structure and characteristics of the Resistors market is particularly conducive to a price-fixing agreement, rendering allegations of collusion particularly plausible. These factors are discussed below.

**A.     Industry Concentration**

111.     A high degree of concentration facilitates coordination among co-conspirators. The fewer competitors in a market, the easier it is for those competitors to collude. The Resistors market is highly concentrated.

112.     The Conspirators are the dominant players in the Resistors market. For example, in 2003, Conspirators KOA, ROHM, Kamaya, HDK, and Panasonic held approximately 51% of the market for Resistors. Their market shares have remained fairly stable for more than a decade.

113.     The Conspirators possessed sufficient market share to impose price increases and ensure price stabilization during the Relevant Period.

**B.     High Barriers to Entry**

114.     The presence of significant entry barriers to potential competitors that could otherwise cause the incumbents to reduce their prices helps facilitate coordination among co-conspirators.

115.     Companies seeking to manufacture and sell Resistors, without having any prior involvement in the Resistors market, face various significant barriers to their entry. Thus, those fringe

companies producing Resistors could not sufficiently ramp up production to become large enough to undermine the conspiracy.

116.     The barriers to entry for new market participants are quite high. Barriers to entry into the Resistors markets include: (i) patents; (ii) high research and development costs; (iii) capital costs to build a manufacturing facility; (iv) investments in machinery and production lines; and (v) maintenance of a sizable sales, marketing and technical support organization.

117.     Likewise, leading Resistors manufacturers have reported spending between 4-6% of revenue on research and development – the equivalent of millions if not hundreds of millions of dollars a year.

118.     New market entrants would need substantial start-up capital – exceeding hundreds of millions of dollars – in addition to access to production technology, raw materials, and sufficient supply chain commitments to warrant such a significant outlay of capital.

119.     The Resistors manufacturing industry is a mature one dominated by established corporations, most having multinational operations, global market reach, and diverse product portfolios of all types of passive electrical components. These companies – Defendants here – have significant experience in the global Resistors industry and established reputations with both sellers of raw materials and purchasers of finished Resistors. These companies typically have access to significant financial resources that allow them to commit the capital necessary to bring online new fabrication operations and facilities or to expand/retrofit existing ones to meet and exceed market demand and adjust to technological changes. This readily available access to capital also permits manufacturers like Defendants the ability to establish and secure necessary supply chain commitments for all raw materials they require. Defendants are all established manufacturers in the Resistors industry.

### C.     Inelastic Demand

120.     Price elasticity of demand is the measure of responsiveness in the quantity demanded for a product as a result of change in price of the same product. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue. Inelastic demand is another indicator that a price-fixing conspiracy would be successful.

121.    As set forth above, Resistors are critical to the manufacture of certain types of electrical circuits used in electronic devices. KOA's own internal documents acknowledge that chip Resistors are "the building block of almost all electronic circuits" and are used to improve the reliability and functionality of electrical components through the creation and maintenance of an optimal level of current.

122.    When there are few or no substitutes for a product, purchasers have little choice but to pay higher prices in order to produce their product. Because OEMs, circuit assemblers, and third-party distributors regularly have inflexible production and delivery deadline commitments with their own customers, there often is no immediate substitute for Resistors needed to make those commitments. Indeed, no other type of passive electrical component (such as an inductor or capacitor) would be able to serve an equivalent function and thus to satisfy production and delivery demands the Conspirators' purchasers had no alternatives to Resistors.

### D.    Interchangeable, Commodity-like Products

123.    A commodity is a product that is standardized across suppliers allowing for a high degree of substitutability among different suppliers in the market. When products offered by different suppliers are viewed as interchangeable by purchasers, market participants typically compete on the basis of price rather than other attributes such as product quality or customer service rendering it is easier for participants both to agree on prices for the product and to monitor these prices.

124.    In the Resistors market, standardization is a key element in the design of electronic components such as Resistors. Indeed, both the International Electrical Commission ("IEC") and American National Standards Institute ("ANSI") promulgate standards denoting Resistor sizes, values, markings, and measurement methods. Resistors are mass-produced pursuant to these standardized manufacturing processes rendering them mutually interchangeable.

125.    Moreover, Resistors of like resistance are interchangeable. Thus, even if certain aspects of a given Resistor differs, so long as the amount of resistance remains constant Resistors are substitutable.

126.    The Conspirators are aware of the interchangeability of their products. The Conspirators have even created cross-reference guides that list competitor's Resistors by product number or technical and operational specifications with a corresponding reference to those Resistors offered by the

Conspirators that are interchangeable.

127. Indeed, the Conspirators' own internal documents referred to thick film chip Resistors as "commodity chips" and acknowledged the interchangeability of their Resistor products. For example, 2011 KOA minutes discuss ramp up of "commodity flat chip production," also referred to as "standard products," and distinguish these from high margin Resistor products.

128. Because Resistors of like resistance are interchangeable, commodity-like products, in a competitive market, manufacturers would compete largely on the basis of price. Where, as here, prices have remained stable or increased, market conditions are suggestive of collusive conduct.

**E.   Declining Demand**

129. Static or declining demand renders collusion more likely. Under normal business conditions, when faced with weak demand conditions firms will attempt to maintain sales by taking market share from competitors via price competition. Stable or increasing prices in the face of static or declining demand is yet another characteristic that is suggestive of anticompetitive conduct among market participants.

130. As discussed more fully above, demand for Resistors has steadily declined since the early 2000s both as a result of declining demand for consumer electronics and also due to technological trends favoring the smaller design of such electronics that, in turn, require fewer Resistors. Despite these demand conditions, prices for Resistors have remained relatively stable since 2003.

**F.   Excess Manufacturing Capacity**

131. The existence of excess manufacturing capacity tends to have a negative correlation with price because manufacturers have the ability to steal share by lowering prices and increasing production. As witnessed in 2001, this trend is even stronger in an environment of declining demand because manufacturers have no choice but to compete for a smaller number of potential buyers. Where prices remain stable or rise in an environment of excess manufacturing capacity and declining demand, it becomes more likely that anticompetitive behavior is afoot.

132. As described in more detail above, both before and during the Relevant Period, the Conspirators possessed excess manufacturing capacity and demand for Resistors has steadily declined. However, after 2003, these market conditions did not result in dramatic price reductions. To the contrary,

prices often remained stable or even rose. These pricing trends are suggestive of anticompetitive conduct.

### G.    Opportunities for Conspiring and Sharing Information

133.    Because of their common membership and participation in trade associations and interrelated business relationships between certain executives, officers, and employees of the Conspirators, there were many opportunities both before and during the Relevant Period for the Conspirators to collude by discussing competitive information regarding their Resistors.

134.    Industry trade associations make a market more susceptible to collusive behavior because they can provide a pretext under which conspirators can exchange sensitive company information such as pricing and market allocation.

135.    A number of industry trade associations exist and count the Conspirators among their members. For example, Defendants are all members of the Japan Electronics and Information Technology Industries Association ("JEITA"), a prominent trade organization. Additionally, Defendants were also members of the Passive Components Marketing Services group and the Electronic Components Industry Association, trade associations that facilitated the conspiracy by collecting and aggregating competitive information including sales in terms of dollars and units. The aggregate data was then circulated to the Conspirators with a short time lag, allowing the Conspirators to monitor each other's pricing.

136.    The Conspirators also attended various trade conferences that allowed them to meet without drawing attention. For example, the employees of the Conspirators regularly attended the Electronics Distribution Show and the Consumer Electronics Show. These trade shows provided numerous opportunities for the Conspirators to meet privately to further the conspiracy.

137.    Additionally, many of the Conspirators also manufactured other passive electronic components, including capacitors. These Conspirators regularly met in secret to fix prices and exchange confidential non-public information, and engage in cartel activity with respect to the capacitors industry. For example, Panasonic conspired in violation of the antitrust laws with capacitor manufacturers, including at times Defendant ROHM, starting no later than January 1, 2003. These meetings provided yet another opportunity for the Conspirators to further their conspiracy as to Resistors.

/ / /

## VIII.   FRAUDULENT CONCEALMENT

138.    Flex did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 2015, when foreign competition authorities began investigating the industry.

139.    The Conspirators recognized the unlawful nature of their conspiracy and took steps to conceal it. For example, recognizing the collusive nature of discussions within the JEITA Passive Components Business Committee and its Resistors subcommittees, the Committee in 2008 changed the entries on its meeting minutes to begin referring to "information exchange concerning general market conditions" instead of "information exchange conducive to corporate management," as it had previously, in order to conceal participants' ongoing collusive discussions including individual companies' Resistor prices, sales, and production capacity. JEITA meetings were held in private settings and their minutes were not made public.

140.    As described above, key participants in the conspiracy concealed their activities by warning each other to treat collusive discussions as "confidential," by referring to co-conspirators with code words, and by reminding their co-conspirators to not distribute evidence of their competitive information exchanges outside the conspiracy.

141.    Because the Conspirators' alleged conspiracy was kept secret until at least July 2015, Flex was unaware of the Conspirators' unlawful conduct alleged herein, and they did not know before that time that they were paying supra-competitive prices for Resistors throughout the United States and the world during the Relevant Period.

142.    The Conspirators' concerted pricing remained unnoticed for many reasons including the facts that pricing for these Resistors changes frequently and the sheer number and variety of Resistors rendered it difficult to track market-wide movement in pricing. Before July 2015, Flex reasonably considered the Resistors industry to be a competitive industry.

143.    Under the circumstances surrounding the Conspirators' collusive practices, the Conspirators' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that the Conspirators' pricing was conspiratorial. Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of the Conspirators' Resistors

prices before July 2015.

144.   Flex could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Conspirators to avoid detection of and fraudulently conceal their conspiracy.

145.   None of the facts or information available to Flex prior to July 2015, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.

146.   As a result of the Conspirators' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to any claims that Flex has alleged in this Complaint.

147.   The Conspirators engaged in a successful anti-competitive conspiracy concerning Resistors, which they affirmatively concealed, at least in the following respects:

> (a) By communicating secretly to discuss output and prices of Resistors;
>
> (b) By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme;
>
> (c) By attributing pricing to reasons other than their anticompetitive agreement; and
>
> (d) By falsely describing the market for Resistors as competitive.

148.   As a result of the Conspirators' fraudulent concealment, all applicable statutes of limitations affecting Flex's claims have been tolled.

## IX.   EFFECTS OF THE CONSPIRACY

149.   Because of the Conspirators' illegal conspiracy, Flex was injured in its business or property because Flex paid more for Resistors than it otherwise would have paid in a competitive market.

150.   The Conspirators' unlawful contract, combination, or conspiracy has had at least the following effects:

> (a)   price competition in the Resistors market was artificially restrained;
>
> (b)   prices for Resistors sold by the Conspirators have been raised, fixed, maintained, or stabilized at supra-competitive levels; and
>
> (c)   purchasers of Resistors from the Conspirators have been deprived of the

benefit of free and open competition in the Resistors market.

151.    Flex directly purchased approximately $500 million worth of Resistors from the Conspirators during the Relevant Period. Flex's global Resistor purchasing is overseen by management employees located in San Jose, California.  Flex purchases of Resistors worldwide typically are made in United States dollars.

152.    Many of the Resistors purchased by Flex were imported into the United States and used at Flex's United States manufacturing facilities, purchased for use in the manufacture of products for United States customers, or assembled into products sold to United States corporations or end-users.

153.    Electronics and electrical product companies, including many located in the United States, rely on manufacturers such as Flex to manufacture devices that include electronic and electrical components.

154.    Flex typically directly purchases the electric and electronic components, including Resistors, necessary to manufacture products for Flex's customers. Flex then uses its global manufacturing, supply chain, and logistical expertise to manufacture and deliver products to Flex's customers worldwide, including businesses and end-users in the United States.

155.    For example, in 2007, Flex purchased part number RK73B2BTTD473J, a thick film linear Resistor, from KOA for delivery to Flex's Dallas, Texas facility. Flex also purchased the same Resistor from KOA in 2007 at Flex facilities worldwide for Flex's U.S.-based end customers.

156.    Flextronics International USA, Inc. purchased Resistors directly from the Conspirators during the relevant time period.  For example, Flextronics International USA, Inc. purchased part number ERJ2RKF2050X, a thick film linear Resistor, from Panasonic in 2008 for delivery to its Milpitas, California facility.

157.    The overall conspiracy alleged herein (1) targeted United States companies; (2) targeted companies producing goods for United States businesses; and (3) targeted Resistors incorporated into products sold to United States end-users directly. As a result, Defendants' conduct substantially and foreseeably impacted United States commerce and gives rise to antitrust and other claims by Flex.

158.    The Conspirators' sales of Resistors to Flex for the manufacture of products that were intended for sale to United States customers or end-users involved import commerce, and had a

substantial, direct and reasonably foreseeable effect on United States import commerce that gives rise to a claim by Flex under United States law.

159.    Certain of the Conspirators also collusively allocated sales of Resistors to be used in certain products manufactured by Flex for its United States customers. The participating conspirators understood when making these agreements that the market allocation would increase prices to United States businesses and customers, and had a substantial, direct, and reasonably foreseeable impact on United States consumers.

160.    Certain of the Conspirators that sold particular types of Resistors to Flex's United States customers specifically agreed on prices to be charged to those United States customers.

161.    Certain of the Conspirators also exchanged data specifically referencing EMS operations in the United States and other United States customers of Flex.

162.    As a direct and proximate result of the Conspirators' anticompetitive and unlawful conduct, Flex was injured in its business and property in that it paid artificially inflated prices for the Resistors it purchased directly from the Conspirators.

## X.    CAUSE OF ACTION
### SHERMAN ACT VIOLATION § 1 15 U.S.C. § 1
#### (Alleged Against All Defendants)

163.    Flex incorporates and re-alleges each allegation set forth in the preceding paragraphs of this Complaint.

164.    Beginning at least as early July 1, 2003, and continuing thereafter, the Conspirators, by and through their officers, directors, employees, agents, or other representatives, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to restrict output and to artificially raise, fix, maintain, or stabilize prices for linear Resistors in the United States, and entered into a continuing agreement, understanding and conspiracy in restraint of trade to exchange information regarding output and production capacity that had the effect of restricting output and of fixing, raising, maintaining, or stabilizing the prices of Resistors.

165.    Flex has been injured in its business and property by reason of the Conspirators' unlawful combination, contract, conspiracy, and agreement. Flex has paid more for Resistors than it otherwise would have paid in the absence of the alleged conspiracy. This injury is of the type the federal antitrust

laws were designed to prevent and flows from that which makes the Conspirators' conduct unlawful.

166.    Accordingly, Flex seeks damages, to be trebled pursuant to federal antitrust law, and costs of suit, including reasonable attorneys' fees.

## XI.    DEMAND FOR JUDGMENT

**WHEREFORE,** the Flex requests that the Court enter judgment on their behalf by adjudging and decreeing that:

A.    That the contract, combination, or conspiracy, and the acts done in furtherance thereof by the Conspirators be adjudged to have violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

B.    That judgment be entered for Flex against Defendants for three times the amount of damages sustained by Flex as allowed by law.

C.    That Flex recover pre-judgment and post-judgment interest as permitted by law.

D.    That Flex recover its costs of the suit, including attorneys' fees, as provided by law.

E.    For such other and further relief as is just and proper under the circumstances.

Dated:  July 25, 2018

WILLIAMS MONTGOMERY & JOHN LTD.

By:    _/s/ Charles E. Tompkins_____
      Charles E. Tompkins, *pro hac vice*
      *forthcoming*
      Eric R. Lifvendahl, *pro hac vice forthcoming*

RAINS LUCIA STERN ST. PHALLE & SILVER, PC

By:    __/s/ Eustace de Saint Phalle_____
      Eustace de Saint Phalle
      *Attorneys for Flextronics International USA, Inc.*

1

## **JURY TRIAL DEMANDED**

2          Pursuant to Federal Rule of Civil Procedure 38(b), Flex demands a trial by jury of all the claims

3  asserted in this complaint so triable.

4  Dated:  July 25, 2018

5                                                    WILLIAMS MONTGOMERY & JOHN LTD.

6                                                    By:    */s/ Charles E. Tompkins*
                                                           Charles E. Tompkins, *pro hac vice*
7                                                          *forthcoming*
                                                           Eric R. Lifvendahl, *pro hac vice forthcoming*
8
                                                     RAINS LUCIA STERN ST. PHALLE &
9                                                    SILVER, PC

10                                                   By:    */s/ Eustace de Saint Phalle*
11                                                         Eustace de Saint Phalle
                                                           *Attorneys for Flextronics International USA,*
12                                                         *Inc.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### EXHIBIT A

### FLEXTRONICS INTERNATIONAL USA, INC'S AFFILIATES

| | Legal Entity Name |
|---|---|
| 1. | Advance Mold & Manufacturing, Inc. |
| 2. | AGM Automotive Costa Rica S.A. |
| 3. | AGM Automotive Mexico, LLC |
| 4. | AGM Automotive, LLC |
| 5. | AGM Durmont Austria GmbH |
| 6. | AGM Durmont Mexico, S. de R.L. de C.V. |
| 7. | AGM Holding GmbH |
| 8. | Astron Group Limited |
| 9. | Avail Medical Products, Inc. |
| 10. | Availmed, S.A. de C.V. |
| 11. | BISSELL Asia Development Center (Shenzhen) Limited |
| 12. | Centrex Precision Plastics, Inc. |
| 13. | Chatham International Holdings B.V. |
| 14. | Chengdu Flextronics Mechanical Manufacturing Co., Ltd. |
| 15. | Ciii Ltd. |
| 16. | Ciii USA, Inc. |
| 17. | Commercial Company in the form of a limited liability company factory "Flextronics LLC" |
| 18. | Dii International Holdings C.V. |

|       | Legal Entity Name |
|-------|-------------------|
| 19.   | Dongguan Flextronics Precision Metal Co., Ltd. |
| 20.   | Dovatron Mfg. |
| 21.   | Elementum Holding Ltd |
| 22.   | Elementum SCM (Cayman) Ltd |
| 23.   | Elementum SCM (Deutschland) GmbH |
| 24.   | Elementum SCM Argentina S.R.L. |
| 25.   | Elementum SCM Europe Ltd. |
| 26.   | Elementum SCM Ltd |
| 27.   | Elementum SCM, Inc. |
| 28.   | Express Cargo Forwarding Limited |
| 29.   | Farm Design, Inc. |
| 30.   | Finchley Trading Limited |
| 31.   | Flex Automotive GmbH |
| 32.   | Flex Digital Health, Inc. |
| 33.   | Flex Electronics (Shanghai) Co., Ltd. |
| 34.   | Flex Home Product Co Ltd |
| 35.   | Flex International s.r.o. |
| 36.   | Flex IDE8 Hong Kong Limited |
| 37.   | Flex IDE8 Manufacturing (Tianjin) Co., Ltd. |
| 38.   | Flex Lighting Solutions, Inc. |

|  | Legal Entity Name |
|---|---|
| 39. | Flex Ltd. |
| 40. | Flex Luxembourg Holdings S.a.r.l. |
| 41. | Flex Precision Plastics Solutions (Switzerland) AG |
| 42. | Flex Solutions Nordic AB |
| 43. | Flex Solutions Poland sp. z o.o. |
| 44. | FlexMedical Slovakia s. r. o. v likvidácii |
| 45. | Flextronics (Canada) Inc. |
| 46. | Flextronics (China) Electronics Technology Co., Ltd. |
| 47. | Flextronics (Israel) Ltd. |
| 48. | Flextronics (Malaysia) Sdn. Bhd. |
| 49. | Flextronics (Shanghai) Co., Ltd |
| 50. | Flextronics (Shanghai) Electronic Equipment Repair Service Co., Ltd. |
| 51. | Flextronics Aerospace & Defense Services Inc |
| 52. | Flextronics Aichi K.K. |
| 53. | Flextronics America, LLC |
| 54. | Flextronics AP, LLC |
| 55. | Flextronics Asset and Investments LLC Hungary |
| 56. | Flextronics Australia Pty Ltd |
| 57. | Flextronics Automotive (Suzhou) Co., Ltd. |
| 58. | Flextronics Automotive de Juarez, S.A. de C.V. |

|     | **Legal Entity Name** |
|-----|-----------------------|
| 59. | Flextronics Automotive GmbH & Co. KG |
| 60. | Flextronics Automotive Inc. |
| 61. | Flextronics Automotive Sales and Marketing, Ltd. |
| 62. | Flextronics Automotive USA (Texas), LLC |
| 63. | Flextronics Automotive USA Design and Development Corporation |
| 64. | Flextronics Automotive USA Manufacturing Co. |
| 65. | Flextronics Automotive USA, Inc. |
| 66. | Flextronics Automotive Verwaltungs GmbH |
| 67. | Flextronics Beerse N.V. |
| 68. | Flextronics Bermuda Ltd. |
| 69. | Flextronics Canada Design Services, Inc. |
| 70. | Flextronics Cayman (SLR) Limited |
| 71. | Flextronics Central Europe B.V. |
| 72. | Flextronics Chateaudun S.N.C. |
| 73. | Flextronics China (Mauritius) Electronics Technology Co., Ltd. |
| 74. | Flextronics China Holding (Singapore) Pte. Ltd. |
| 75. | Flextronics Computing (Suzhou) Co., Ltd |
| 76. | Flextronics Computing Mauritius Limited |
| 77. | Flextronics Computing Sales and Marketing (L) Ltd. |
| 78. | Flextronics Corporation |

|     | Legal Entity Name |
|-----|-------------------|
| 79. | Flextronics Design Asia Pte. Ltd. |
| 80. | Flextronics Design Consumer Electronics (India) Private Limited |
| 81. | Flextronics Design Korea Ltd. |
| 82. | Flextronics Design S.r.l. |
| 83. | Flextronics Design, s.r.o. |
| 84. | Flextronics Electronics (Mauritius) Limited |
| 85. | Flextronics Electronics Technology (Shenzhen) Co., Ltd. |
| 86. | Flextronics Electronics Technology (Suzhou) Co., Ltd. |
| 87. | Flextronics Enclosure (Zhuhai) Co., Ltd |
| 88. | Flextronics Enclosure Zhuhai (Mauritius) Co., Ltd. |
| 89. | Flextronics Enclosure System (Changzhou) Ltd. |
| 90. | Flextronics Enclosure Systems (Shenzhen) Ltd. |
| 91. | Flextronics Enclosures (Hong Kong) Limited |
| 92. | Flextronics Europe Holdings C.V. |
| 93. | Flextronics Europe Holdings LLC |
| 94. | Flextronics Europe Limited |
| 95. | Flextronics Fabricação de Equipamentos do Brasil Ltda. |
| 96. | Flextronics Foundation |
| 97. | Flextronics Funding LLC |
| 98. | Flextronics Global Enclosures (Shanghai) Co., Ltd. |

|  | Legal Entity Name |
|---|---|
| 99. | Flextronics Global Enclosures (Singapore) Pte. Ltd. |
| 100. | Flextronics Global Enclosures Shanghai (Mauritius) Co., Ltd |
| 101. | Flextronics Global Holdings II Ltd. |
| 102. | Flextronics Global Holdings L.P. |
| 103. | Flextronics Global Procurement Ltd. |
| 104. | Flextronics Global Services (Manchester) Limited |
| 105. | Flextronics Global Services (Singapore) Pte. Ltd. |
| 106. | Flextronics Global Services Canada Inc. Services Globaux Flextronics Canada Inc. |
| 107. | Flextronics Global Services Lojistik Hizmetleri Limited ªirketi |
| 108. | Flextronics Guadalajara Group, S. de R.L. de C.V. |
| 109. | Flextronics Holding (Singapore) Pte. Ltd. |
| 110. | Flextronics Holding do Brasil Ltda. |
| 111. | Flextronics Holding Finland Oy |
| 112. | Flextronics Holding France S.A. |
| 113. | Flextronics Holding GmbH |
| 114. | Flextronics Holding USA, Inc. |
| 115. | Flextronics Holdings Mexico Dos, S.A. de C.V. |
| 116. | Flextronics Holdings Mexico, S.A. de C.V. |
| 117. | Flextronics Holdings Spain, S.L.U. |
| 118. | Flextronics Ind. (Malaysia) Sdn. Bhd. |

|       | **Legal Entity Name**                                                  |
|-------|------------------------------------------------------------------------|
| 119.  | Flextronics Industrial (Shenzhen) Co Ltd                               |
| 120.  | Flextronics Industrial (Suzhou) Co., Ltd.                              |
| 121.  | Flextronics Industrial (Zhuhai) Co., Ltd.                              |
| 122.  | Flextronics Industrial Ltd.                                            |
| 123.  | Flextronics Industrial Shenzhen (Mauritius) Co Ltd.                    |
| 124.  | Flextronics Industrial Zhuhai (Mauritius) Co., Ltd.                    |
| 125.  | Flextronics Industries (H.K.) Limited                                  |
| 126.  | Flextronics Industries Marketing (L) Ltd.                              |
| 127.  | Flextronics Industries Singapore Ltd.                                  |
| 128.  | Flextronics Information Technology (Shen Zhen) Co., Ltd                 |
| 129.  | Flextronics Information Technology Shen Zhen (Mauritius) Co., Ltd.      |
| 130.  | Flextronics Instituto de Tecnologia – FIT                              |
| 131.  | Flextronics Integrated Services Mex, S. de R.L. de C.V.                |
| 132.  | Flextronics International (Singapore Group) Pte. Ltd.                   |
| 133.  | Flextronics International (Thailand) Ltd.                              |
| 134.  | Flextronics International AB                                            |
| 135.  | Flextronics International Asia-Pacific Ltd                              |
| 136.  | Flextronics International Componentes Ltda.                             |
| 137.  | Flextronics International Cork B.V.                                     |
| 138.  | Flextronics International Cork B.V. (Irish Branch)                      |

|       | Legal Entity Name |
|-------|-------------------|
| 139.  | Flextronics International de Amazonia Ltda. |
| 140.  | Flextronics International Denmark A/S |
| 141.  | Flextronics International DK |
| 142.  | Flextronics International Europe B.V. |
| 143.  | Flextronics International Finland Oy |
| 144.  | Flextronics International France S.A. |
| 145.  | Flextronics International Germany GmbH & Co. KG |
| 146.  | Flextronics International Gesellschaft m.b.H. |
| 147.  | Flextronics International Holding LLC (CA) |
| 148.  | Flextronics International Holding LLC (DE) |
| 149.  | Flextronics International Holdings Pte. Ltd. |
| 150.  | Flextronics International Ireland Limited |
| 151.  | Flextronics International Itatiaia (Xerox) |
| 152.  | Flextronics International Japan Co., Ltd |
| 153.  | Flextronics International Kft. |
| 154.  | Flextronics International L'Aquila SpA |
| 155.  | Flextronics International Latin America (L) Ltd. |
| 156.  | Flextronics International Lojýstýk Hýzmetler Týcaret Lýmýted Þýrketý |
| 157.  | Flextronics International Ltd. |
| 158.  | Flextronics International Management Services Ltd. |

|  | Legal Entity Name |
|---|---|
| 159. | Flextronics International N.V. |
| 160. | Flextronics International Norway AS |
| 161. | Flextronics International Ostersund AB |
| 162. | Flextronics International Poland Sp. z o.o. |
| 163. | Flextronics International s.r.o. |
| 164. | Flextronics International Sweden AB |
| 165. | Flextronics International Taiwan Ltd. |
| 166. | Flextronics International Technology LLC |
| 167. | Flextronics International Tecnologia Ltda |
| 168. | Flextronics International Termelõ és Szolgáltató Vámszabadterületi Korlátolt Felelõsségû Társaság |
| 169. | Flextronics International UK Ltd. |
| 170. | Flextronics Investment Holding (Singapore) Pte. Ltd. |
| 171. | Flextronics Investment Holding GmbH |
| 172. | Flextronics Italy S.p.A. |
| 173. | Flextronics Laval S.N.C. |
| 174. | Flextronics Lighting Solutions, Inc. |
| 175. | Flextronics Link (HK) Ltd. |
| 176. | Flextronics LLC |
| 177. | Flextronics Logistics (Hong Kong) Limited |
| 178. | Flextronics Logistics (Zhuhai) Co., Ltd. |

|  | Legal Entity Name |
|---|---|
| 179. | Flextronics Logistics B.V. |
| 180. | Flextronics Logistics Poland sp. z o.o. |
| 181. | Flextronics Logistics USA, Inc. |
| 182. | Flextronics Logistics Zhuhai (Mauritius) Co., Limited |
| 183. | Flextronics Manufacturing (H.K.) Limited |
| 184. | Flextronics Manufacturing (Shanghai) Co., Ltd. |
| 185. | Flextronics Manufacturing (Singapore) Pte. Ltd. |
| 186. | Flextronics Manufacturing (Tianjin) Co., Ltd. |
| 187. | Flextronics Manufacturing (Zhuhai) Co., Ltd. |
| 188. | Flextronics Manufacturing Aguascalientes, S.A. de C.V. |
| 189. | Flextronics Manufacturing Europe B.V. |
| 190. | Flextronics Manufacturing Juarez, S. de R.L. de C.V. |
| 191. | Flextronics Manufacturing Mex, S.A. de C.V. |
| 192. | Flextronics Manufacturing Puebla, S. de R.L. de C.V. |
| 193. | Flextronics Manufacturing S.r.l. |
| 194. | Flextronics Manufacturing Shanghai (Mauritius) Co., Ltd. |
| 195. | Flextronics Manufacturing Zhuhai (Mauritius) Co., Ltd. |
| 196. | Flextronics Marketing (L) Ltd. |
| 197. | Flextronics Mauritius Holdings Limited |
| 198. | Flextronics Mauritius Limited |

|     | Legal Entity Name |
|-----|-------------------|
| 199. | Flextronics Mechanicals Marketing (L) Ltd. |
| 200. | Flextronics Mechanicals Singapore Pte. Ltd. |
| 201. | Flextronics Medical Sales and Marketing, Ltd |
| 202. | Flextronics Mexico Holdings II LLC |
| 203. | Flextronics New Zealand Limited |
| 204. | Flextronics ODM Finland Oy |
| 205. | Flextronics ODM Luxembourg S.A. |
| 206. | Flextronics Ostersund AB |
| 207. | Flextronics Photonics FICO, Inc. |
| 208. | Flextronics Photonics PPT, Inc. |
| 209. | Flextronics Plastic (Asia Pacific) Limited |
| 210. | Flextronics Plastic Technology (ShenZhen) Ltd. |
| 211. | Flextronics Plastic Technology ShenZhen (Mauritius) Ltd. |
| 212. | Flextronics Plastics (M) Sdn. Bhd. |
| 213. | Flextronics Plastics (Shenzhen) Co., Ltd |
| 214. | Flextronics Plastics (Singapore) Pte. Ltd. |
| 215. | Flextronics Plastics (Zhuhai) Co., Ltd |
| 216. | Flextronics Plastics Gushu (Mauritius) Co., Ltd |
| 217. | Flextronics Plastics Services, LLC |
| 218. | Flextronics Plastics Zhuhai (Mauritius) Co., Ltd. |

|  | Legal Entity Name |
|---|---|
| 219. | Flextronics Plastics, S.A. de C.V. |
| 220. | Flextronics Power Systems (Dongguan) Co., Ltd. |
| 221. | Flextronics Precision Metal (Hong Kong) Limited |
| 222. | Flextronics Precision Plastics, Inc. |
| 223. | Flextronics Puerto Rico Limited |
| 224. | Flextronics R&D (Shenzhen) Co., Ltd |
| 225. | Flextronics R&D Shenzhen (Mauritius) Co., Ltd |
| 226. | Flextronics Romania S.R.L. |
| 227. | Flextronics S.R.L. |
| 228. | Flextronics Sales & Marketing (A-P) Ltd. |
| 229. | Flextronics Sales & Marketing North Asia (L) Ltd. |
| 230. | Flextronics Sales and Marketing Consumer Digital Ltd. |
| 231. | Flextronics San Jose IPO |
| 232. | Flextronics Sárvár Logistics Korlátolt Felelõsségû Társaság |
| 233. | Flextronics Scotland Limited |
| 234. | Flextronics Shah Alam Sdn. Bhd. |
| 235. | Flextronics Shanghai (Mauritius) Co., Ltd. |
| 236. | Flextronics Shanghai Electronic Equipment Repair Service (Mauritius) Co., Ltd. |
| 237. | Flextronics SMI (China) Ltd |
| 238. | Flextronics St-Etienne S.N.C. |

|      | **Legal Entity Name**                                        |
|------|--------------------------------------------------------------|
| 239. | Flextronics Systems (Penang) Sdn. Bhd.                       |
| 240. | Flextronics Systems Texas Ltd.                               |
| 241. | Flextronics Technologies (India) Private Limited             |
| 242. | Flextronics Technologies Luxembourg LLC                      |
| 243. | Flextronics Technologies Luxembourg S.a r.l.                 |
| 244. | Flextronics Technologies Mauritius Ltd.                      |
| 245. | Flextronics Technologies Mexico, S. de R.L. de C.V.          |
| 246. | Flextronics Technologies San Luis, S.A. de C.V.              |
| 247. | Flextronics Technology (Malaysia) Sdn. Bhd.                  |
| 248. | Flextronics Technology (Nanjing) Co., Ltd                    |
| 249. | Flextronics Technology (Penang) Sdn. Bhd.                    |
| 250. | Flextronics Technology (Shah Alam) Sdn. Bhd.                 |
| 251. | Flextronics Technology (Shanghai) Co., Ltd.                  |
| 252. | Flextronics Technology (ShenZhen) Co., Ltd                   |
| 253. | Flextronics Technology (Singapore) Pte. Ltd.                 |
| 254. | Flextronics Technology (Suzhou) Co., Ltd.                    |
| 255. | Flextronics Technology (Switzerland) GmbH                    |
| 256. | Flextronics Technology (Zhuhai) Co. Ltd.                     |
| 257. | Flextronics Technology Nanjing (Mauritius) Co., Ltd          |
| 258. | Flextronics Technology Shanghai (Mauritius) Co., Ltd.        |

| | Legal Entity Name |
|---|---|
| 259. | Flextronics Technology ShenZhen (Mauritius) Co., Ltd |
| 260. | Flextronics Technology Wujiang (Mauritius) Ltd |
| 261. | Flextronics Technology Zhuhai (Mauritius) Co., Ltd |
| 262. | Flextronics Tecnologia Do Brasil Ltd. |
| 263. | Flextronics Telecom Systems Ltd |
| 264. | Flextronics UK Limited |
| 265. | Flextronics Vagyonkezelō és Befektetési Korlátolt Felelõsségû Társaság |
| 266. | Flextronics Verwaltungs GmbH |
| 267. | FlextronicsTullamore |
| 268. | Glouple Ventures 2000-II, LLC |
| 269. | IDE8 Cayman |
| 270. | IDE8 Mauritius Limited |
| 271. | IDE8 Technology (Shanghai) Co., Ltd |
| 272. | I E C Holdings Limited |
| 273. | Instrumentation Engineering, Inc. |
| 274. | International Manufacturing Synergies, Ltd. |
| 275. | Irish Express Cargo Limited |
| 276. | Irumold Group, S.L.U. |
| 277. | Irumold Servicios, S.L.U. |
| 278. | Irumold, S.L.U. |

|  | Legal Entity Name |
|---|---|
| 279. | Kiinteisto Oy Flex Finland |
| 280. | Kunshan AGM Automotive Components Co., Ltd. |
| 281. | Kunshan AGM Trading Company Ltd. |
| 282. | Lab IX |
| 283. | Lighting Acquisition LLC |
| 284. | Masa da Amazônia Ltda. |
| 285. | MCi (Mirror Controls International) Asia B.V. |
| 286. | MCi (Mirror Controls International) B.V. |
| 287. | MCi (Mirror Controls International) Holdings B.V. |
| 288. | MCi (Mirror Controls International) Inc. |
| 289. | MCi (Mirror Controls International) Ireland Limited |
| 290. | MCi (Mirror Controls International) Ireland Operations Limited |
| 291. | MCi (Mirror Controls International) Netherlands B.V. |
| 292. | MCi (Mirror Controls International) S. de R.L. de C.V. |
| 293. | MCi (Mirror Controls International) Yuhan Hoesa |
| 294. | MCi Hoogeveen B.V. |
| 295. | MCi Ireland Pension Plan Trustee Limited |
| 296. | MCi Mirror Controls (Suzhou) Co., Ltd. |
| 297. | MICOH B.V. |
| 298. | Multek (FTZ) Limited |

|  | Legal Entity Name |
|---|---|
| 299. | Multek Brasil Ltda. |
| 300. | Multek China Limited |
| 301. | Multek Display (Hong Kong) Limited |
| 302. | Multek Display Cayman Ltd. |
| 303. | Multek Electronics Limited |
| 304. | Multek Flexible Circuits, Inc. |
| 305. | Multek Hong Kong Limited |
| 306. | Multek Industries Limited |
| 307. | Multek Technologies Limited |
| 308. | Multek Technology (Zhuhai) Co Limited |
| 309. | Multek Zhuhai Limited |
| 310. | Multilayer Technology Geschäftsführungs GmbH |
| 311. | Multilayer Technology GmbH & Co. KG |
| 312. | Nanjing Flextronics Panda Mobile Terminals Co., Ltd |
| 313. | NEXTracker Australia Pty. Ltd. |
| 314. | NEXTracker Chile SpA |
| 315. | NEXTracker, Inc. |
| 316. | NEXTRACKER Mexico, S. de R.L. de C.V. |
| 317. | Pacific Device, Inc. |
| 318. | Parque de Tecnologia Electronica, S.A. de C.V. |

| | Legal Entity Name |
|---|---|
| 319. | Power Systems R&D (Singapore) Pte. Ltd. |
| 320. | Power Systems R&D Philippines, Inc. |
| 321. | Power Systems Technologies (Beijing) Company Limited |
| 322. | Power Systems Technologies (Ganzhou) Co., Ltd. |
| 323. | Power Systems Technologies (Shenzhen) Company Limited |
| 324. | Power Systems Technologies Far East Limited |
| 325. | Power Systems Technologies GmbH |
| 326. | Power Systems Technologies Ltd. |
| 327. | Private Joint Stock Company "Flextronics Service UA" |
| 328. | PT. Flextronics Technology Indonesia |
| 329. | Saturn Electronics de Monterrey, S.A. de C.V. |
| 330. | Shiant Resource Service Co., Ltd |
| 331. | SLR Europe B.V. |
| 332. | SLR GmbH |
| 333. | Solectron (Shanghai) Technology Co., Ltd. |
| 334. | Solectron Australia Pty Limited |
| 335. | Solectron France SAS |
| 336. | Solectron Holding Deutschland GmbH |
| 337. | Solectron Phillipines Inc. |
| 338. | Solectron Sweden AB |

|      | **Legal Entity Name** |
|------|------------------------|
| 339. | Solectron Turkey |
| 340. | Solectron USA, LLC |
| 341. | Sønderborg Værktøjsfabrik A/S |
| 342. | Stellar Microelectronics, Inc. |
| 343. | Suzhou AGM Durmont Automotive Components Co., Ltd. |
| 344. | Swedform Enclosure Systems AB |
| 345. | The DII Group (BVI) Co. Limited |
| 346. | The DII Group Asia Limited |
| 347. | ThermoMend B.V. |
| 348. | ThermoMend International Ltd. |
| 349. | Vastbright PCB (Holding) Limited |
| 350. | Vista Point Electronic Technologies (Zhuhai) Co., Ltd. |
| 351. | Vim Technologies Ltd |
| 352. | Wink Labs, Inc. |
| 353. | Z124 |